IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| IVICA KOVAČIĆ, | * |
| Plaintiff, | * |
| | * |
| v. | Civil Action No.: RDB-17-0044 |
| | * |
| DANIJELA HARRIS, *pro se*, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), ratified by Congress under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, requires that when a child under the age of sixteen has been wrongfully removed or retained from his or her country of habitual residence, the court must generally order the return of the child, unless certain exceptions apply. Plaintiff Ivica Kovačić ("Plaintiff" or "Mr. Kovačić") brings this Verified Complaint under the Hague Convention for the Return of his Child to Croatia, alleging that his ex-wife, Defendant Danijela Harris ("Defendant" or "Mrs. Harris"), has been wrongfully retaining their daughter, N.K., in the United States since December of 2015. (ECF No. 1.) On July 2 and 3, 2018, this Court held a hearing and bench trial on whether Mrs. Harris is wrongfully retaining N.K. in the United States and, if so, whether two exceptions to ordering N.K.'s return apply.

For the reasons explained below, this Court concludes that while Mrs. Harris is wrongfully retaining N.K. in the United States under the Hague Convention, N.K. has

1

reached an age and degree of maturity that this Court takes into account her objections to returning to Croatia and does not order her return. Accordingly, Plaintiff Ivica Kovačić's Verified Complaint for Return of Child to Croatia (ECF No. 1) is DENIED.

## BACKGROUND

On January 6, 2017, Mr. Ivica Kovačić filed a Verified Complaint under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, seeking the return of his daughter, N.K., to Croatia where, if necessary and appropriate, a further custody and visitation determination can be made by a Croatian court under Croatian law.[1] On September 7, 2017, this Court approved the parties' voluntary stipulation of dismissal on the ground that they had "agreed to settle this matter and ha[d] fully executed a settlement agreement." (ECF Nos. 36, 37.) Six months later, however, Plaintiff Kovačić filed a Motion for Relief from Judgment, asserting that Mrs. Harris had not honored commitments to intermittently send N.K. to Croatia. (ECF No. 39.) This Court granted Plaintiff's Motion, reopened the case, and pursuant to Local Rule 101.1a permitted Mrs. Harris to represent herself.[2] (ECF No. 41.) Shortly thereafter, this Court scheduled a bench trial for July 2 and 3, 2018.

Prior to the bench trial, Plaintiff filed two motions for partial summary judgment.[3] The first motion was for partial summary judgment on his affirmative Hague Convention claim. As explained in this Court's prior Opinions in this case, "the [Hague] Convention provides that a child who was 'wrongfully removed' from his place of habitual residence in

---

[1] This case was initially assigned to Judge Marvin J. Garbis of this Court, but was re-assigned to the undersigned Judge Richard D. Bennett on May 31, 2017.

[2] Prior to the reopening of this case on April 10, 2018, Defendant was represented by counsel.

[3] Plaintiff also filed a Motion *in Limine* to admit official Croatian government declarations, which this Court granted by Memorandum Opinion and Order. (ECF Nos. 55, 56.)

violation of a person's custody rights must be returned to that place unless certain 'narrow exceptions' apply." (ECF No. 24, *Kovačić v. Harris*, No. RDB-17-0044, 2017 WL 2719362 (D. Md. June 23, 2017); ECF No. 55, *Kovačić v. Harris*, No. RDB-17-0044, 2018 WL 3105775 (D. Md. June 25, 2018).) Article III of the Hague Convention provides that a child's removal is "wrongful" where "it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention." Finding that a hearing would be helpful to determine whether Plaintiff Kovačić has custody rights over N.K. as defined by the Hague Convention, this Court scheduled a hearing on this legal issue prior to the start of trial.

The second motion was for partial summary judgment on Defendant's third affirmative defense, which invoked the "well-settled" exception in Article 12 of the Hague Convention. The "well-settled" exception provides that if the parent filing suit under ICARA did so more than one year after the date of wrongful removal or retention, the other parent may defend against the suit by showing that the child is now settled in the new environment. *Kovačić*, 2018 WL 3105772. Plaintiff, however, filed suit one day shy of a full year since the date of alleged wrongful retention. Mrs. Harris made the decision to stay in the United States with N.K. on January 7, 2016, and Mr. Kovačić filed this action on January 6, 2017. Therefore, this defense was not available to Mrs. Harris and this Court granted Plaintiff's motion.

## FINDINGS OF FACT

On July 2 and 3, 2018, this Court conducted a hearing on Plaintiff's partial motion for summary judgment on his affirmative Hague Convention claim and a bench trial on

whether two exceptions to N.K.'s return apply. Based on the testimony and documentary evidence presented, this Court makes the following findings of fact.[4]

Plaintiff Ivica Kovačić and Defendant Danijela Harris (formerly Kovačić) were married on February 22, 2003 in Desna Martinska Ves, Croatia. (Croatian 2009 Judgment, Pl.'s Ex. 1.) On May 31, 2003, their daughter, "N.K.", was born. (*Id.*) She is currently fifteen-years-old.

Mrs. Harris testified that four years after N.K. was born, Mrs. Harris and her husband separated because he "was abusive to [her] physically and psychologically [and] emotionally," and also abusive to his mother and grandmother. (July 2 Tr. 114:19-20.) Two years after the couple separated, on February 9, 2009, the parties formally dissolved their marriage in the Municipal Court in Sisak. (Pl.'s Exh. 1.) The Municipal Court Judgment entered that day ordered that N.K. "will live with the mother Danijela Kovačić in Sisak . . . [and] parental care remains shared." (*Id.*) The Judgment further set a specified schedule for Mr. Kovačić's visitation with N.K., including every other weekend while N.K. was in school, "the first half of all winter, spring and summer school holidays, . . . other holidays alternately, and according to the agreement of parents." (*Id.*) In line with the Judgment, N.K. stayed with her father while she was in school every second weekend from Friday until Sunday. (July 2 Tr. 32:16-20.) Mr. Kovačić testified that due to work, he would miss a weekend with N.K. approximately four times a year. (*Id.* at 38:25-39:1-2.)

Two years later, Mr. Kovačić sought to amend the Municipal Court's Judgment,

---

[4] At the request of Plaintiff and by agreement of the parties, N.K. testified under seal but on the record, with the parties, counsel, and court personnel present, and she was subject to cross-examination. All citations to the transcripts of these proceedings refer to the redacted transcripts unless otherwise indicated.

asserting that N.K. should be entrusted to his care due to a change in circumstances. (Croatian 2011 Amended Judgment, Pl.'s Ex. 2.) The court declined Mr. Kovačić's petition, noting a "problem of communication" between the parties "about their shared care of the minor child," and finding that there was not a sufficient change in circumstances warranting an amended judgment. (*Id.*)

During this time, N.K. was still visiting with her father pursuant to the Municipal Court's visitation schedule. She testified, however, that when she would go to her father's, she spent most of the time with her friends and her paternal grandmother. (July 2 Tr. 133:8-10) (sealed). When sleeping at her father's home, she slept downstairs with her grandmother. (*Id.*) Her father slept on the top floor of the home with his current wife, with whom N.K. testified she does not have a good relationship. (*Id.* at 132:19-22.)

In 2015, Mrs. Harris and N.K. decided to travel to the United States to visit Mrs. Harris' family, including her ill grandmother and aunt. (July 2 Tr. 117:5-7.) Mrs. Harris testified that she has relatives who have been living in the United States for a long time. (*Id.*) N.K. was twelve-years-old at the time and needed to obtain a tourist visa. In order to do so, Mr. Kovačić notarized a statement declaring that he gave Mrs. Harris permission to request a tourist visa for their daughter. (July 2 Tr. 40:18-20; Pl. Exh. 3.) He further stated that "I also agree that once her visa is issued, my daughter has my permission to spend her winter school vacation, 2015-2016, in the United States of America, in the company of Danijela Kovačić." (Pl. Exh. 3.) On the night Mrs. Harris and N.K. were leaving Croatia, however, N.K. testified that Mr. Kovačić grabbed Mrs. Harris' wrist and would not let her go. (July 2 Tr. 134:2-5) (sealed). When N.K. and Mrs. Harris got into the car, he banged on the windows

and doors, screaming and yelling. (*Id.*)

On January 7, 2016, Mrs. Harris told Mr. Kovačić that she and N.K. would not be returning to Croatia. Mrs. Harris and N.K. testified that they decided to stay so that N.K. could enroll in school and take English classes.[5] (July 2 Tr. 117:7-11.) Fourteen days later, on January 21, 2016, Mr. Kovačić filed a Request for Return in Croatia under Article 3 of the Hague Convention. (July 2 Tr. 43:4-44:6; Pl.'s Ex. 12.) Subsequently, on February 8, 2016, the Assistant Minister for the Ministry for Demography, Family, Social Policy, and Youth ("the Ministry")[6] sent the United States Department of State, Office of Children's Issues a letter stating:

> According to Mr. Kovačić, Danijela Kovačić illegally and without his consent and approval, and against his will, retained their minor child N.K. in the United States of America . . . Please note that according to the Croatian Family Act parents equally, jointly and consensually care about children, regardless of the fact whether they live together or they are separated. . . Therefore, the decision about residence of the child has to be made jointly by both parents or by the decision of the court. The mother retained the minor N.K. with her in the United States of America, without the knowledge . . . of Mr. Kovačić, contrary to reached agreement and the Croatian legislation. . . . We kindly ask you to take, without any delay, all necessary steps to secure the prompt return of minor N.K. to Croatia, who has been wrongfully removed to the United States of America, by her mother.

(Pl.'s Ex. 12.)[7] The letter also stated that if the United States Office of Children's Issues had any questions, they could contact Ms. Sunčica Lončar, Service for International Cooperation

---

[5] Six months later, Mrs. Harris married a United States citizen and subsequently applied for a "green card." (ECF No. 42-3 at 19-20.) Under the Immigration and Nationality Act, an alien who marries a United States citizen may petition the government for permanent residency, and if granted, receives a Permanent Resident Card commonly referred to as a "green card." *United States v. Sonmez*, 777 F.3d 684, 686 n. 1 (4th Cir. 2015) (citing 8 U.S.C. §§ 1151(a), 1151(b)(2)(A)(i), 1154(a), 1186(a)).

[6] The letter indicates that it is from the Ministry of Social Policy and Youth. (Pl. Ex. 12.) As evident from a subsequent letter, the Ministry was renamed to Ministry for Demography, Family, Social Policy, and Youth. (Pl. Ex. 13.)

[7] In a subsequent letter by the Ministry, the Secretary noted that after this letter was issued, "the parties agreed on contacts."

in the Field of Protection of Children and Coordination of Social Security System. (*Id.*)

While N.K. was staying with her mother in the United States, she testified that at first she and her father talked almost every other day through Facebook messenger. (July 2 Tr. 146:1-7) (sealed). They also had two video calls via skype early into her stay in January and February of 2016. (July 3 Tr. 44:21-23.) Over time, however, their communications slowed down and N.K. stopped responding as often to her father's messages. (July 2 Tr. 136:9-10) (sealed). She testified that he was rude to her and her family and on one occasion made an inappropriate comment. (*Id.* at 136:12-25.)

Almost one year after Mrs. Harris told Mr. Kovačić that she and N.K. were staying in the United States, Plaintiff filed a Verified Complaint in this Court under the Hague Convention for the Return of his Child to Croatia. (ECF No. 1.) This Court scheduled a bench trial for Thursday, September 14, 2017 and Friday, September 15, 2017. On September 7, 2017, however, the parties filed a stipulation of dismissal, asserting that they had "agreed to settle this matter and ha[d] fully executed a settlement agreement." (ECF No. 36.) This Court approved the dismissal that day. (*Id.*) Having planned on being present for the bench trial, Mr. Kovačić flew to the United States four days later on Monday, September 11, 2017. (July 3 Tr. 2:3-17.) Specifically, he was in this country from Monday, September 11, 2017 through Friday, September 15, 2017. (*Id.*) He flew into Washington, D.C., and traveled to Newark, Delaware to visit N.K. (*Id.*) This was the first time Mr. Kovačić had been in the United States or seen N.K. since the departure in December of 2015.

N.K. testified that during that visit on Tuesday, September 12, 2017, she and her father went to get lunch. (July 2 Tr. 137:25) (sealed). While at lunch, her father tried to

convince her that she did not understand or speak English well. (*Id.* at 137:25-138:2.) N.K. testified that after lunch she told her father "how [she] felt and that [she] wanted to stay [in the United States] and live here." (*Id.* at 138:3-6.) When Mr. Kovačić would not listen, N.K. called her mother to pick her up. (*Id.* at 138:5.) Mr. Kovačić then became upset, and "told [N.K.] that we can go in court again." (*Id.* at 138:5-6) The entire visit lasted approximately an hour and a half.

The next day, Mrs. Harris encouraged N.K to meet with her father again. (July 2 Tr. 120:17-19.) N.K., however, did not want to see him. (*Id.* at 120:16-17.) Messages between N.K. and her father indicate that N.K. had planned on spending more time with her father while he was in the country, but he had "really hurt" her during the visit. (Def. Exh. 2.) Later that day, Mrs. Harris sent Mr. Kovačić a message through N.K.'s phone stating:

> I called you, Danijela. [N.K.] is crying so much and she doesn't wanna even talk to us now. She is just saying she doesn't wanna see you. I ask you to try to establish any kind of normal communication between us . . ..
>
> [T]ry to be gentle with her, it will take time for everyone but she is most important in all of this. I'm doing whatever I can. I'm the one who suggested that she shows you her school and studio and show you where she lives. She refuse [sic] it, especially after yesterday.

(*Id.*) In response, Mr. Kovačić wrote "[y]es, thank you. I can see you are trying really hard." (*Id.*) Accordingly, the assertion by Mr. Kovačić that Mrs. Harris exercised undue influence over their daughter is rebutted by the undisputed facts in this case.[8] After this visit, N.K. responded to her father's messages even less frequently. (July 2 Tr. 138:24-139:1) (sealed).

---

[8] After trial, Plaintiff filed a Motion to Clarify the Record, seeking to "clarify" that his response of "[y]es, thank you. I can see you are trying really hard" was intended as "sarcasm." (ECF No. 67.) The Plaintiff, however, did not exhibit any difficulty in testifying in English or responding to questions from counsel or this Court. Further, he had every opportunity to explain his testimony. Accordingly, this Motion is denied.

Although he wrote her every couple of days, she only sent him messages such as Merry Christmas, Happy Birthday, and other celebratory messages. (July 2 Tr. 143:11-20.)

Sometime between the September 2017 visit and February 2, 2018, Mr. Kovačić claims Mrs. Harris did not honor the settlement agreement. Mr. Kovačić filed another Request for Return in Croatia under Article 3 of the Hague Convention. (Pl.'s Ex. 12.) Subsequently, on February 2, 2018, the Assistant Minister for the Ministry sent another letter to the United States Department of State, Office of Children's Issues stating that N.K. had been wrongfully retained in the United States and asked for her prompt return. (*Id.*) Six weeks later, on March 19, 2018, Plaintiff Kovačić filed a Motion for Relief from Judgment, (ECF No. 39), which this Court granted. (ECF No. 41.)

During the bench trial, N.K., who is currently fifteen-years-old, testified that she does not want to return to Croatia with her father. (July 2 Tr. 140:15-19) (sealed). She currently lives with her mother and stepfather in Elkton, Maryland. She objects to returning to Croatia because most of her family and friends are here in the United States; the friends she had in Croatia have moved to a different city. (*Id.*) She also objects to living with her father in Croatia, testifying that he has never been there for her when she needed him, and she is afraid of what he might do after these court proceedings. (*Id.* at 140:22-25.) She did testify, however, that although she is not open to having a relationship with her father right now, she may in the future "if things changed, and he shows that he cares about me and about my decisions." (*Id.* at 141:3-5.)

N.K. impressed this Court as an extremely mature fifteen-year-old. She was able to testify in great depth about her relationship with her father. Specifically, she testified that one

of her father's first comments to her, after having not seen her for over a year and a half, was "oh, you're wearing makeup." (July 2 Tr. 137:16-18) (sealed). This is in contrast to Mr. Kovacic's testimony that he does not want his child "raised knowing that she can do illegal and immoral things." (July 3 Tr. 22:10-12.) In short, this Court finds as a factual matter that N.K. seemed more mature and measured in her testimony than did her father. Indeed, she did not attempt to embellish her testimony with respect to any physical reactions of her father. (July 2 Tr. 148:5-15) (sealed). However, she was quite clear in referencing that even in past years "he was never there for me when I needed him." (*Id.* at 140:23.)

## CONCLUSIONS OF LAW

The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "the Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, was enacted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."[9] The Convention's "central operating feature" is that it provides for a return remedy: "[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 9, 130 S. Ct. 1983 (2010) (quoting Hague Convention, Articles 4, 12). Removal or retention is "wrongful" under the Convention if: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal or retention; (2) the removal or retention violated the petitioner's

---

[9] *See* Hague Convention, Preamble.

custody rights under the law of the home country; and (3) the petitioner had been exercising those rights at the time of removal or retention. *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017) (citing *Bader v. Kramer (Bader II)*, 484 F.3d 666, 668 (4th Cir. 2007)). If a parent makes a *prima facie* showing of wrongful retention or removal, the burden shifts to the abducting parent to show that an exception applies and the court should not order the return of the child.

Prior to trial, this Court held a hearing on Plaintiff's motion for partial summary judgment on his affirmative Hague Convention claim. For the reasons set forth on the record and as explained in more detail below, Plaintiff Kovačić established a *prima facie* case of wrongful retention. The issues remaining—and the issues litigated during the bench trial—are whether one of the exceptions to the return remedy applies. Specifically, Mrs. Harris argues that returning N.K. to Croatia would subject her to a grave risk of physical or psychological harm and that she is of sufficient age and maturity that this Court should take into account her objections to returning.[10] This Court first explains why Mr. Kovačić has joint custody rights over N.K before addressing whether one of the exceptions to the return remedy applies.

## I.      Wrongful Retention under the Hague Convention

Removal or retention is "wrongful" under the Hague Convention if: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal or retention; (2) the removal or retention violated the petitioner's custody rights under the law

---

[10] During the bench trial, this Court noted Plaintiff's objection to the consideration of the "grave risk" exception given that this affirmative defense was not pled in Defendant's Answer while she was still represented by counsel. Given Defendant's *pro se* status since the re-opening of this case and the interests at stake, this Court permitted Defendant to introduce evidence supporting this affirmative defense.

of the home country; and (3) the petitioner had been exercising those rights at the time of removal or retention. *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017) (citing *Bader v. Kramer (Bader II)*, 484 F.3d 666, 668 (4th Cir. 2007)). The first and third elements of wrongful retention were not in dispute in this case. Rather, Defendant Harris argued that Plaintiff Kovačić did not have custody rights within the meaning of the Hague Convention at the time she decided to retain N.K. in the United States.

The Hague Convention provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, Article 5(a). Custody rights under the Convention may be established by operation of law, judicial or administrative decision, or agreement of the parties. *Id.* at Article 3.

Mrs. Harris and Mr. Kovačić married in Croatia in February of 2003 and had their daughter, N.K. later that year. Six years later, on February 9, 2009, the parties divorced. In the Municipal Court of Sisak's Divorce Decree, the court ordered that N.K. would "live with the mother Danijela Kovačić in Sisak . . . [and that p]arental care remain[ed] shared." (Pl.'s Ex 1.) Six years later, Mrs. Harris—with the permission of Mr. Kovačić—departed Croatia with N.K. to the United States to see Mrs. Harris' sick aunt and grandmother. Before doing so, N.K. obtained a tourist visa. In order to obtain the tourist visa, Mrs. Harris needed Mr. Kovačić's permission. (July 2 Tr. 40:18-20; Pl. Exh. 3.) Mr. Kovačić notarized a statement giving Mrs. Harris permission to obtain a visa for N.K., and further stated that "I also agree that once her visa is issued, my daughter has my permission to spend her winter school vacation, 2015-2016, in the United States of America, in the company of Danijela Kovačić."

(Pl. Exh. 3.) On January 7, 2016, however, Harris decided to stay with N.K. in the United States.

During the hearing, Plaintiff presented the testimony of Dr. Tena Hoško, an expert on the Hague Convention and the matters of alleged wrongful removal. She explained that the 2003 Croatian Family Act ("2003 Act") governs the parties' parental and custody rights over N.K. because the parties divorced in 2009. (July 2 Tr. 74:15-18.) She highlighted three important paragraphs of the 2003 Act:

> 91.1: Parental care comprises responsibilities, duties and rights of parents, with the aim of protecting child's welfare, personal and proprietary interests.
>
> 99.1: Regardless of whether the parents live together or separately, they shall care of the child indiscriminately, jointly, and consensually.
>
> 101: If the parents fail to reach an agreement on how to accomplish the contents of parental care or realize the child's rights, the court shall issue a decision for the protection of the child's welfare . . ..

Dr. Hoško explained that Paragraph 99.1 is an "umbrella provision" that means "all decisions regarding the child have to be taken consensually, indiscriminately, and jointly," including deciding the child's permanent place of residence. (July 2 Tr. 90:2-7.) Dr. Hoško also explained that under the 2003 Act, a parent is deprived of parental care and responsibility only if the parent dies, is deprived of parental responsibility, or is deprived of legal responsibility. (*Id.* at 76:18-25.) Accordingly, because the 2009 Municipal Court Judgement ordered that "parental care remained shared," both Mr. Kovačić and Mrs. Harris maintained their responsibilities, duties and rights of parents including determining N.K.'s permanent place of residence. (*Id.* at 78:12-79:17.) Therefore, Mrs. Harris was required to petition a Croatian Court in order to keep N.K. in the United States without the permission

of Mr. Kovačić. (*Id.* at 84:11-85:4.)

On cross-examination, Mrs. Harris asked Dr. Hoško whether the 2003 Act specifically stated that the parent with physical custody cannot determine the child's permanent place of residence without the other parent's consent. (July 2 Tr. 89:25-90:19.) On this point, this Court considered the declaration of Matea Marija Jandras Crnalic, a Croatian family law attorney who has been practicing family law for the past seven years.[11] (July 2 Tr. 101:10-23; ECF No. 43-1.) She declares that after having reviewed the 2009 and 2011 Croatian Judgments and the 2003 and 2015 versions of the Croatian Family Act, Harris has sole physical custody of N.K. and has the sole right to determine her permanent place of residence. (*Id.*) Crnalic's declaration emphasizes that the 2003 Act—the Act in place at the time of the parties' divorce—does not contain a restriction specifically preventing a parent with physical custody from moving a child to a new permanent place of residence. (*Id.*) Rather, this restriction was added to the 2015 Croatian Family Act, which does not apply to the parties' divorce. (*Id.*) Crnalic therefore concludes that Defendant Harris has sole physical custody of N.K. and the sole right to determine her place of residence. (*Id.*)

In light of Dr. Hoško's testimony, however, this argument is without merit. In the 2003 Act, Paragraphs 91.1 and 99.1 provide that "parental care"—which the Municipal Court of Croatia ordered be shared between Mrs. Harris and Mr. Kovačić—includes the responsibilities, duties and rights of parents, and regardless of who has physical custody of the child, the parents shall care for the child indiscriminately, jointly, and consensually. This

---

[11] Crnalic's declaration had been filed in conjunction with previous pleadings. Although Defendant Harris did not call the expert during the bench trial, given her *pro se* status and this Court's ultimate rejection of Crnalic's argument, this Court considered the declarations.

includes the decision to determine the child's permanent place of residence. This testimony is consistent with the 2016 and 2018 letters from the Ministry for Demography, Family, Social Policy, and Youth which cite Paragraphs 99 and 101 and state "the decision about residence of the child has to be made jointly by both parents or by the decision of the court." (Pl.'s Exs. 12, 13.)

Further, Plaintiff introduced two declarations of Sunčica Lončar, a Senior Adviser for the Ministry and the point of contact listed on the 2016 letter from the Ministry. (Pl.'s Exs. 4, 5.) She explains that the Ministry is a Croatian government agency that performs administrative functions regarding social and family welfare, including aiding Croatian citizens whose children have been wrongfully removed from Croatia. She also describes how under Croatian Law, a parent can only be deprived of legal custody if they become deceased or a court deprives them of "legal capacity." She declares that neither the 2009 or 2011 Croatian Court Judgments deprived Kovačić of legal capacity but rather explicitly stated "parental care remains shared." Therefore, Lončar states that it is the official position of the Ministry of Demography, Family, Youth and Social Policy—consistent with the 2016 and 2018 letters—that (1) Mr. Kovačić has custody rights over N.K. and therefore (2) N.K. is being wrongfully retained in the United States without the consent of Plaintiff Kovačić, in violation of his custody rights.

Based on Dr. Hoško's testimony, the 2016 and 2018 letters from the Ministry of Demography, Family, Youth and Social Policy, and Lončar's declarations, this Court finds that Plaintiff Kovačić has established that he has custody rights under the Hague Convention and Mrs. Harris is wrongfully retaining N.K. in the United States.

## II.    Article 13 Exceptions

Having found that Plaintiff established wrongful retention under the Hague Convention, Defendant Harris argues that this Court should decline to order the return of N.K. because two exceptions apply. The Hague Convention's "central operating feature" of a return remedy "is not absolute." *Lozano v. Montoya Alvarez*, __ U.S. __, 134 S. Ct. 1224, 1229 (2014). Rather, there are a limited number of "narrow exceptions." *Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 393 (2016). The parties have litigated the possible applicability of two exceptions found in Article 13 of the Hague Convention.

The first exception is the "grave risk" exception. This exception provides that a court is not required to order the return of a wrongfully removed or retained child if the court finds that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). The party objecting to the child's return must prove that the grave risk exception applies by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A)  (formerly 42 U.S.C. § 11630(e)(2)(A)).

Second, there is the "age and maturity" exception. This exception provides that a court is not required to order the return of a wrongfully removed or retained child if the court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13. The party objecting to the child's return must prove that this exception applies by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B) (formerly 42 U.S.C. § 11630(e)(2)(B)).

Notably, however, the Hague Convention provides that if a court finds that one of these exceptions applies, the court is "not bound to order the return of the child." Hague Convention, Article 13. Accordingly, if this Court finds that one of the exceptions applies, this Court may still decide to order the return of N.K. to Croatia. *Alcala v. Hernandez*, 826 F.3d 161 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 393 (2016) ("We have previously held that under the Hague Convention courts retain the discretion to order return even if one of the exceptions is proven." (citing *Miller v. Miller*, 240 F.3d 392, 399 (4th Cir. 2001))); *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,509 ("The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies."). The decision of whether or not to order return if an exception applies "is grounded in principles and equity." *Alcala*, 826 F.3d at 175. This Court addresses each exception below.

### a. Grave Risk Exception

For the grave risk exception to apply, Defendant Harris must show by clear and convincing evidence that "there is a grave risk that [N.K.'s] return would expose [her] to physical or psychological harm or otherwise place [her] in an intolerable situation." Hague Convention, Art. 13(b). This exception must be construed narrowly to avoid evading the underlying purpose of the Hague Convention. *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 350 (D. Md. 2017).

The risk must be grave, not merely serious, and "more than the trauma associated with uprooting and moving the child back to the country of habitual residence." *Luis Ischiu*, 274 F. Supp. 3d at 350; *see also Baxter v. Baxter*, 423 F.3d 363, 373 n. 8 (3d Cir. 2005)

(explaining that the grave risk exception only applies if "the alleged physical or psychological harm is a great deal more than minimal . . . [and] something greater than would normally be expected on taking a child away from one parent and passing him [or her] to another" (internal citations and quotations omitted)). Therefore, this exception typically applies to situations involving sexual abuse, significant physical and verbal abuse of the child, or domestic abuse of a spouse in the presence of the child. *Luis Ischiu*, 274 F. Supp. 3d at 350 (citations omitted). It does not apply to allegations of "poor parenting"; it is not the court's role to "determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the environment offered by Petitioner." *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 596 (D.S.C. 2013).

This Court begins by noting that there has been no testimony or evidence of sexual abuse. As to physical abuse, Mrs. Harris testified that she left her and Mr. Kovačić's home in 2007 because he was "physically and psychologically abusive." (July 2 Tr. 114:19-20.) This general assertion, however, was Mrs. Harris' only testimony regarding physical abuse. She further stated that she never sought medical attention for any alleged abuse or filed a police report. (*Id.* at 124:19-21.) N.K. then testified that her father has never physically or verbally abused her. (July 2 Tr. 148:5-15) (sealed). There was, however, one incident on the night she and her mother were leaving Croatia where she was afraid of her father. (*Id.* at 134:2-5.) She testified that on that night, Mr. Kovačić grabbed Mrs. Harris' wrist and would not let her go. (*Id.*) When Mrs. Harris and N.K. then got into their car, he banged on the windows, screaming and yelling. (*Id.*) N.K. testified that she was scared because she did not know what her father was going to do next. (*Id.* at 7.)

Nevertheless, on the record before this Court, Mrs. Harris has not shown by clear and convincing evidence that N.K.'s return to Croatia would subject her to a grave risk of exposure to physical or psychological harm or otherwise place her in an intolerable situation. Indeed, as this Court has noted, N.K. specifically stated that her father has never physically abused her. (July 2 Tr. 148:5-15) (sealed). *See Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000) (finding that the grave risk exception did not apply when the father verbally abused the mother and the child's older sibling, and on one occasion, shoved the mother and threw a rock at her car, but did not physically or psychologically abuse the child). Mrs. Harris's additional allegations, including that Plaintiff never visited N.K.'s school in Croatia, did not attend her dance recitals, and failed to visit N.K. when she was in the hospital (July 2 Tr. 116:3-117:4), are at most allegations of "poor parenting," not evidence of grave risk of harm. *See Hirst v. Tiberghien*, 947 F. Supp. 2d 578 (D.S.C. 2013) (finding that two nine and ten year old children would not be at grave risk of harm despite allegations of "poor parenting, including Petitioner's alleged drinking and smoking, her alleged use of foul language toward the children, and her alleged tendency to sleep late").

Finally, the United States Court of Appeals for the Fourth Circuit has instructed that even if a court finds that a parent truly poses a danger to his or her child, the grave risk exception does not apply if "the [foreign] courts are ready and able to take every step to protect" the parent and child. *Miller v. Miller*, 240 F.3d 392, 402 (4th Cir. 2001). Therefore, even if Defendant's allegations caused this Court concern about N.K.'s return to Croatia, the Municipal Court in Sisak could be trusted to adequately respond to these issues and protect N.K. and Mrs. Harris. For these reasons, Defendant has not met her burden of showing by

clear and convincing evidence that there is a grave risk that N.K.'s return would expose her to physical or psychological harm or otherwise place her in an intolerable situation.

### b. Age and Maturity Exception

For the age and maturity exception to apply, Defendant Harris must establish by a preponderance of the evidence that N.K. "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views." Hague Convention, Art. 13. Accordingly, this objection requires that this Court make two findings: (1) N.K. "has attained an age and degree of maturity at which it is appropriate to take account of [her] views"; and (2) N.K. "objects to being returned." A court must exercise discretion when evaluating this exception "because of the potential for undue influence by the person who allegedly wrongfully retained the child." *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 576 (M.D.N.C. Feb. 10, 2010) (quoting *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002)).

### i. Age and Degree of Maturity

The Hague Convention does not set an age at which a child is mature enough for the court to take into account his or her objection to being returned. *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339 (D. Md. 2017) ("[T]here is no specific age below which a child could not be considered sufficiently mature to express such a view."). Therefore, the inquiry is necessarily a factual determination to be made on a case-by-case basis. *See Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016) ("Whether the child has reached an appropriate age and degree of maturity is a factual determination and thus subject to clear error review."). Courts have thus found that the exception applies to a wide range of ages. *See Rodriguez v. Yanez*, 817

F.3d 466 (5th Cir. 2016) (affirming the district court's determination that a nine-year-old girl had reached an age and degree of maturity to take account of her views, but remanding on the issue of whether she objected to being returned); *Castillo v. Castillo*, 597 F. Supp. 2d 432 (D. Del. 2009) (finding that an eleven-year-old girl had reached an age and degree of maturity); *Vasconcelos v. Batista*, 512 F. App'x 403, 408 (5th Cir. 2013) (affirming the district court's determination that the thirteen-year-old child had reached an age and degree of maturity); *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007) (affirming the district court's determination that the thirteen-year-old child had reached an age and degree of maturity); *Trudrung v. Trudrung*, 686 F. Supp. 2d 570 (M.D.N.C. 2010) (finding that the fifteen-year-old child had reached an age and degree of maturity).

Notably, however, the Hague Convention does set an age at which the Convention—and therefore the return remedy—no longer applies. "The Convention shall cease to apply when the child attains the age of 16 years." Hague Convention, Art. 4; *see also Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) (dismissing as moot an appeal on behalf of a child who turned sixteen between the district court and appellate proceedings). Accordingly, at fifteen-years-old, N.K. is the oldest age at which the Hague Convention and the return remedy apply.

Based on the testimony presented and this Court's observations of N.K., N.K. has attained an age and degree of maturity at which it is appropriate to take account of her objections to returning to Croatia. N.K. is over fifteen-years-old, and thus less than a year away from the age at which the Hague Convention would no longer apply to her. This Court observed her testify under oath in court, subject to cross examination by her father's

counsel. She displayed a maturity for her age and demonstrated an understanding of the significance of the proceedings. She also spoke articulately considering English is not her first language and presented herself as well-mannered and intelligent. Along with these observations, Mrs. Harris testified that since being in the United States, N.K. has made honor roll every grading period.

Having observed N.K., heard her responses to both her mother and her father's counsel, and noting as described in more detail below that her testimony and objections are not merely expressions of her mother's opinion or otherwise the product of undue influence, she has reached an age and degree of maturity for this Court to take account of her views. *See Trudrung v. Trudrung*, 686 F. Supp. 2d 570 (M.D.N.C. 2010) (finding that the fifteen-year-old child had reached an age and degree of maturity when he presented himself as an intelligent, well-mannered fifteen and one-half year-old, was the appropriate grade level for his age and received suitable grades, presented himself calmly and with poise, and there was no evidence of a learning disability or issues); *see also Castillo v. Castillo*, 597 F. Supp. 2d 432 (D. Del. 2009) (finding that an eleven-year-old girl had reached an age and degree of maturity when she displayed an "impressive maturity" for her age, demonstrated an understanding of the proceeding's purpose and need to be truthful, answered questions in a straightforward manner, and expressed particularized objections).

### ii.  Objects to Being Returned

This Court now turns to whether N.K. "objects to being returned." Under this prong of the analysis, "the court must distinguish between a child's objections as defined by the Hague Convention and the child's wishes as in a typical child custody case, the former being

a 'stronger and more restrictive' standard than the latter." *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 597 (D.S.C. 2013) (quoting *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 206 (E.D.N.Y. 2010)). Further, the court should be wary of whether the child's objection "is the product of the abductor parent's undue influence over the child," even if the influence is unintentional *Id.* (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494–01); *see also Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) ("The discretionary aspect of this [age and maturity] defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child.").

"[T]he district court's finding that a child has or has not objected is a fact-intensive determination that is based in part on the court's personal observations of the child." *Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) (internal quotations and citation omitted). Therefore, "[s]uch determinations are peculiarly within the province of the trial court and must be given 'great deference.'" *Id.* (quoting *United States v. Wright*, 512 F.3d 466, 472 (8th Cir. 2008)). In *de Silva v. Pitts*, 481 F.3d 1279 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit also noted that "great deference" should be given to the judge who personally observes the child, and "[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." 481 F.3d at 1287; *see also Vasconcelos v. Batista*, 512 F. App'x 403, 407 (5th Cir. 2013) ("[I]t is logical to assume that the question of whether [the child] objected is fact-intensive, and thus the district court's finding that she objected is subject to clear error review.").

This Court begins by evaluating whether N.K.'s objections to returning to Croatia appear to be the product of Mrs. Harris' undue influence. *See de Silva*, 481 F.3d at 1286 (explaining that a "child's wishes" should not be considered if the court finds that the child's desires are the "product of undue influence"). Mr. Kovačić testified that N.K. has been "brain washed" by Mrs. Harris. (July 3 Tr. 55:21-23.) Plaintiff emphasizes that N.K. has been in the United States with her mother since December of 2015, and a "lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 280 (3d Cir. 2007).

N.K. testified that Mrs. Harris never spoke poorly or otherwise criticized Mr. Kovačić's role as her father. (July 2 Tr. 135:1-3) (sealed). In fact, both Mrs. Harris and N.K. testified that when Mr. Kovačić visited in September of 2017 and N.K. left her meeting with her father upset, Mrs. Harris encouraged N.K. to try to see her father again. (*Id.* at 138:22-23) (July 2 Tr. 120:16-19.) Further, N.K. testified that she would be open to having a relationship with her father in the future "if things changed, and he showed that he cared about [her] and [her] decisions." (July 2 Tr. 141:3-5) (sealed). On the other hand, N.K. testified that her father openly spoke poorly about her mother and the United States. (*Id.* at 134:8-14, 24-25.)

Further, Mr. Kovačić himself acknowledged in September of 2017 that Mrs. Harris encouraged N.K.'s relationship with her father. During Mr. Kovačić's visit with N.K. in September of 2017, N.K. told him that she wanted to stay in the United States and not return to Croatia. After the visit ended poorly, N.K. did not want to see Mr. Kovačić again.

Mrs. Harris testified that the next day, she tried to encourage N.K. to see her father again, offering to go with her so N.K. could "try some kind of communication." (July 2 Tr. 120:17-19.) When that did not work, Mrs. Harris messaged Mr. Kovačić from N.K.'s phone saying:

> I called you, Danijela. N.K. is crying so much and she doesn't wanna even talk to us now. She is just saying she doesn't wanna see you. I ask you to try to establish any kind of normally communication between us . . ..

> [T]ry to be gentle with her, it will take time for everyone but she is most important in all of this. I'm doing whatever I can. I'm the one who suggested that she shows you her school and studio and show you where she lives. She refuse [sic] it, especially after yesterday.

(Def. Exh. 2.) In response, Mr. Kovačić wrote "[y]es, thank you. I can see you are trying really hard." (*Id.*) Therefore, Mr. Kovačić himself acknowledged in September of 2017—the day after N.K. told him that despite the settlement agreement between her parents, she did not want to return to Croatia—that Mrs. Harris was "trying really hard" to maintain N.K.'s relationship with Mr. Kovačić.[12] There is simply no evidence in this case of undue influence being exercised on N.K. by Mrs. Harris. Any such suggestion flies in the face of Mr. Kovačić's own acknowledgement that his ex-wife was seeking to facilitate a healthy relationship between N.K. and her father.

Addressing Plaintiff's argument as to the length of time N.K. has spent in the United States, Plaintiff cites *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 280 (3d Cir. 2007). In *Tsui*, the defendant took his daughter to the United States when she was five-years-old. Further, by the time of trial, the child had been living in the United States with the defendant for over

---

[12] As explained *supra* note 8, after trial Plaintiff filed a Motion to Clarify the Record, seeking to "clarify" that his response of "[y]es, thank you. I can see you are trying really hard" was intended as "sarcasm." (ECF No. 67.) The Plaintiff, however, did not exhibit any difficulty in testifying in English or responding to questions from counsel or this Court. Further, he had every opportunity to explain his testimony. Accordingly, this Motion is denied.

three years. In contrast, N.K. told her father in September of 2017, less than two years after the wrongful retention, that she did not want to return to Croatia. She was also twelve-years-old when she initially came to the United States with Mrs. Harris. *See Matovski v. Matovski*, No. PKC-06-4259, 2007 WL 2600862, at *4 (S.D.N.Y. Aug. 31, 2007) (finding although, "[a]s of the time of trial, the children had been living in the United States for more than two years" the eleven and twelve year old girls validly objected to returning to Australia); *see also Laguna v. Avila*, No. ENV-07-5136, 2008 WL 1986253, at *11 (E.D.N.Y. May 7, 2008) (noting that although "there is a recognized tendency for a child to be influenced by the preferences of the parent with whom he or she lives . . . the risk of undue influence in a child's testimony is no excuse for judicial paralysis" and finding that the thirteen-year-old child validly objected after living in the United States for fifteen months).

Moreover, the reasons behind N.K.'s objection to returning to Croatia demonstrate that she is not objecting merely because she has been in the United States with her mother since December of 2015. N.K.'s reasons for not wanting to return are similar to those in *Vasconcelos v. Batista*, 512 F. App'x 403, 408 (5th Cir. 2013), where the United States Court of Appeals for the Fifth Circuit affirmed the district court's application of the age and maturity exception when the child (1) expressed she did not want to visit her father when he was in the United States, (2) had particularized ties to the United States including that she had done well in school, was involved in extracurricular activities, and had been receiving treatment for epilepsy, and (3) had virtually no ties to Brazil and "barely any knowledge" of her father who had not communicated with her since she left Brazil. 512 F. App'x at 407-08; *see also Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016) (considering that the child had specific ties to

the United States "whereas he had virtually no ties to Peru and barely any relationship with his father, with whom he has had no contact since arriving in the United States and saw only sporadically prior to leaving Peru"); *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007) (affirming the district court's adoption of the magistrate's recommendation that the age and maturity exception applied when the child (1) had a well-developed understanding of his situation and the positions of his parents, (2) was "not particularly swayed by lavish gifts and wealth in forming an opinion that the schools were better in Oklahoma," (3) enjoyed his friends, activities, and home, and (4) was "well-settled in his environment in Oklahoma and expressed his desire to remain in Oklahoma with [his mother] without apparent adult indoctrination").

N.K. is over fifteen-years-old. She currently lives with her mother and stepfather in Elkton, Maryland. She testified that even before she and her mother left for the United States, most of her visitation time with her father was in fact spent with her friends and her paternal grandmother. (July 2 Tr. 133:8-10) (sealed). She testified that at her father's in Croatia, she slept downstairs in the home with her grandmother while her father slept on the top floor with his current wife, with whom N.K. does not have a good relationship. (*Id.* at 132:19-22, 133:8-10.) She testified that she does not want to return to Croatia because most of her family is here in the United States, her friends are here, and most of the friends she had in Croatia have moved or are moving to a different city. (*Id.* at 140:15-19.) She has also been doing well in school here, receiving awards in English and math and making the honor roll "in every single marking period." (July 2 Tr. 121:8-11.)

At first when she left Croatia, N.K. and her father spoke every other day. Their communication then became less frequent during the first year, but Mr. Kovačić testified that N.K. still responded within a "day or maybe a week, but never more than a month."[13] (July 2 Tr. 46:2-7.) The relationship began to deteriorate, however, and they spoke less. The only time N.K. saw her father prior to this trial was in September of 2017, and only because Mr. Kovačić had booked a flight to be in the United States for the first scheduled trial. He was then in the country for five days, and over those five days, only saw N.K. once for about an hour-and-a-half. N.K. testified that during this hour and a half meeting, her father ridiculed her ability to speak English. When N.K. told her father that she did not want to return to Croatia, she testified that he said "we can go in court again." N.K. ultimately asked her mother to come pick her up and refused to see her father the next day despite Mrs. Harris' pleas to do so in order to "try some kind of communication." (July 2 Tr. 120:17-19.)

It was only after the hour-and-a-half meeting in September of 2017 that N.K.'s relationship with her father drastically deteriorated. N.K. responded to even less of her father's messages, only sending him Merry Christmas, Happy Birthday, and other congratulatory messages. (July 2 Tr. 143:11-20.) This Court especially finds significant—in light of N.K.'s clear objection to returning to Croatia given her deteriorated relationship with Mr. Kovačić and her support system here and lack thereof in Croatia—that N.K. showed the maturity to say that although she is not open to having a relationship with her father right now, she may in the future "if things changed." (July 2 Tr. 141:3-5) (sealed). While he has

---

[13] Therefore, even more compelling and distinct from the facts of *Vasconcelos v. Batista*, 512 F. App'x 403 (5th Cir. 2013) and *Custodio v. Samillan*, 842 F.3d 1084 (8th Cir. 2016) is the fact that N.K. did regularly communicate with her father at first; it was only after her father was "rude to [her] and [her] family" and the September of 2017 visit that their communication deteriorated. (July 2 Tr. 136:12-25) (sealed).

never been there for her when she needed him, and is afraid of what he might do after these court proceedings, "if things changed, and he shows that he cares about me and about my decisions, then maybe" she would be open to having a better relationship with him. (*Id.*)

In light of all of the above, N.K. is not objecting to returning to Croatia merely because of the length of time she has spent with her mother in the United States. She is objecting because she has had a difficult relationship with her father and has very few connections left in Croatia. Accordingly, this Court finds that N.K. is of the "age and degree of maturity at which it is appropriate to take account of [her] views" and she "objects to being returned." Hague Convention, Art. 13. Therefore, under the Hague Convention, although Mrs. Harris is wrongfully retaining N.K. in the United States, this Court is not bound to order her return to Croatia. *See Leites v. Mendiburu,* No. 6:07–cv–2004, 2008 WL 114954, at *6 (M.D. Fl. Jan. 9, 2008) (finding the age and maturity exception applied when the thirteen-year-old (1) was extremely "bright, mature, and articulate," (2) did not want to return to Argentina because she felt that her home in the United States provided a calmer environment, (3) she enjoyed school, friends, and sports and believed that she would have better opportunities in the United States).

Finally, this Court acknowledges its discretion to order the return of N.K. despite finding that the age and maturity exception applies, and declines to do so. *Alcala v. Hernandez,* 826 F.3d 161 (4th Cir. 2016), *cert. denied,* 137 S. Ct. 393 (2016) ("We have previously held that under the Hague Convention courts retain the discretion to order return even if one of the exceptions is proven." (citing *Miller v. Miller,* 240 F.3d 392, 399 (4th Cir. 2001))). Therefore,

Plaintiff Ivica Kovačić's Verified Complaint for Return of Child to Croatia (ECF No. 1) is DENIED.

## CONCLUSION

For the reasons stated above, Plaintiff Ivica Kovačić's Verified Complaint for Return of Child to Croatia (ECF No. 1) is DENIED.


A separate order shall issue.


Dated:  July 12, 2018                                    _____/s/_____

                                                        Richard D. Bennett
                                                        United States District Judge